**Christopher Eugene KENT,**
**Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 45S00–9408–CR–719.

Supreme Court of Indiana.

Dec. 31, 1996.

Charles E. Stewart, Jr., Appellate Public Defender, Crown Point, for Appellant–Defendant.

Pamela Carter, Attorney General, James A. Joven, Deputy Attorney General, Office of Attorney General, Indianapolis, for Appellee–Plaintiff.

BOEHM, Justice.

A jury convicted Christopher Eugene Kent of the murder of three-year-old Joshua Verill. Kent was sentenced to fifty-five years. He presents eight issues for our review which we consolidate and restate as:

I.  Did the trial court abuse its discretion in denying Kent's motions for mistrial based upon several alleged instances of prosecutorial misconduct?

II.  Did the trial court properly admit opinion testimony from a police officer?

III.  Did the trial court err by allowing the prosecutor to impeach Kent's testimony with his voluntary statement to the State?

IV.  Did the trial court abuse its discretion in granting the State's peremptory challenges?

V. Did the trial court err in considering letters from third parties in determining Kent's sentence?

We affirm.

## Facts

In December 1991, Debra Verill, her son Joshua, and her one-year old daughter moved into an apartment with Kent and his daughter in Griffith, Indiana. At approximately 10:00 a.m. on May 11, 1992, Debra left the apartment to run some errands leaving her two children with Kent. About twenty minutes later, Debra returned home and Kent told her in an annoyed tone, "Go look at your son." Debra found Joshua lying on his bed, pale and white in color, perspiring around the hairline, and with a blue spot on his neck. When Debra asked Kent what was wrong with the child, Kent stated that Joshua fell head-first into the bathtub and also fell a second time off of the toilet. Kent told Debra that he was not in the room either time the child fell. Debra then discovered that Joshua was not breathing and called for help.

A few minutes later, Officer Michael Kuhn arrived at the home and found Kent straddling Joshua and roughly thrusting on the child's abdomen. The officer told Kent to stop and pushed Kent away from Joshua. The officer was unable to detect a pulse but observed that the child was attempting to breathe on his own. Less than five minutes later, Officer Marlene Starcevich arrived at the home and started rescue breathing. Shortly thereafter, two paramedics arrived and transported the child to the hospital. The emergency room doctor attempted to resuscitate Joshua but was unsuccessful. A jury found Kent guilty of murder and this appeal ensued.

## I. Prosecutorial Misconduct

■ Kent argues that the trial court erred in denying his motions for mistrial based upon several instances of alleged prosecutorial misconduct. The trial court's ruling on a mistrial is afforded great deference on appeal because the trial court is in the best position to evaluate the circumstances and their impact on the jury. *Bradley v. State*, 649 N.E.2d 100, 107 (Ind.1995). A mistrial is

an extreme remedy invoked only when no other measure can rectify the situation. *Id.* When a motion for mistrial is based upon a claim of prosecutorial misconduct, this Court must determine: 1) whether there was misconduct by the prosecutor; and 2) whether that misconduct, under the circumstances, placed the defendant in a position of "grave peril" to which he should have not been subjected. *Smith v. State*, 516 N.E.2d 1055, 1063 (Ind.1987). The gravity of the peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct. *Bradley*, 649 N.E.2d at 107–08.

■ Kent cites as the first instance of misconduct the prosecutor's offer of a photograph of the child victim with a bruise on his nose. Another photograph of the child had already been admitted. Kent objected to the second photograph and moved for a mistrial at a sidebar conference. The trial court had previously ruled in the State's favor on a motion in limine dealing with the same photograph. However at the sidebar, the trial judge reversed himself and excluded the photograph, agreeing with Kent's argument that it may be more prejudicial than probative. The jury did not see the photograph and they never heard why Kent wanted the photograph excluded. Given that the trial court had previously ruled in the State's favor on the admissibility of the second photograph, the prosecutor's attempt to introduce it was not misconduct. Indeed, Kent's contention that it was misconduct to offer an exhibit that had previously been ruled admissible is itself highly questionable.

■ Kent next claims that the prosecutor improperly elicited testimony from two witnesses in an attempt to indicate to the jury that Kent had abused the child in the past. Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show action in conformity therewith." Ind.Evidence Rule 404(b). Even if the jury hears evidence of uncharged wrongs by the defendant, a prompt admonishment to the jury to disregard the improper testimony is usually enough to avoid a mistrial. *Greenlee v.*

*State,* 655 N.E.2d 488, 490 (Ind.1995). To support a mistrial based on testimony of prior uncharged acts of the defendant, we must evaluate whether the evidence was intentionally injected and the degree of harm to the defendant. *Id.*

■ Kent argues that the first attempt to inject prejudicial testimony came when the prosecutor questioned Dr. Young Kim, a pathologist. The State asked the pathologist his opinion of the cause of the child's death, then followed up with a question regarding what part a neck injury played in the death. The pathologist responded that during the course of an autopsy of the child's body, he observed the neck injury as well as bruises and hemorrhages on the victim's scalp which were indicative of past child abuse. Kent objected to use of the term "child abuse" and the court ordered that term stricken from the record. The court also instructed the jury to determine the facts "from the testimony and evidence admitted by the Court." Record at 132. On its face, the question asked by the State was not formulated to elicit testimony regarding past child abuse.

■ Kent argues that a second attempt to inject prejudicial testimony occurred when the prosecutor was questioning the investigating police officer, Detective Teeling. On direct examination by Kent, the detective was asked about a statement that Debra had made to him regarding her son's hitting his head. On cross-examination by the State, the detective testified that Debra learned of the incident only after the child told her about it. The prosecutor then asked the detective if Debra told him that things had happened to the child when she was not at home to witness them. The detective responded affirmatively and Kent objected on the ground that the question was beyond the scope of direct examination. Record at 1276. After a sidebar conference and a brief hearing outside the presence of the jury, the trial court sustained Kent's objection and prohibited further similar questions. Record at 1285. Once the trial judge ruled on the objection, the prosecutor abandoned that line of questioning. Kent has failed to demonstrate either intentional misconduct or the degree of prejudice necessary for a mistrial

in questioning either the pathologist or the detective. Therefore, the trial court's conclusion that the prosecutor's conduct did not provide a basis for a mistrial was well within its discretion. *See Willoughby v. State,* 660 N.E.2d 570, 576 (Ind.1996) (trial court's ruling on motion for mistrial will be reversed only for an abuse of discretion).

■ Kent next argues that the prosecutor repeatedly attempted to elicit testimony from two expert witnesses that the child had been murdered. The first expert testimony relied upon by Kent was that of Dr. Bonnie Brodkin, the emergency room physician who treated the child at the hospital. While questioning Dr. Brodkin about her emergency room diagnosis, the prosecutor asked, "[W]hy is it in your opinion this child did not choke on his own vomit?" Record at 618. Dr. Brodkin responded, "Because I think he may have been murdered." *Id.* At that point, Kent asked for a sidebar conference and moved for a mistrial. The prosecutor explained that she was trying to ask the doctor about the child's cause of death, not for her legal conclusion. The form of the question is consistent with the explanation. The trial court denied Kent's motion for mistrial, but promptly admonished the jury not to consider the doctor's legal conclusion. After the admonishment, the prosecutor attempted to ask the doctor five additional questions regarding her diagnosis which prompted further objections by Kent. Only two of those five questions were answered and those two were not objected to. The prosecutor then concluded her direct examination of Dr. Brodkin. Again, Kent has failed to prove to the trial court's satisfaction, or ours, that the State acted deliberately to prejudice him. Moreover, the trial court's admonishment, along with a final instruction which told the jury to consider only the evidence admitted at trial, was sufficient to cure any error. *See Greenlee,* 655 N.E.2d at 490.

■ Kent next points to the expert testimony of Dr. Robert Kirschner, a forensic pathologist, to support his claim that the prosecutor repeatedly attempted to elicit improper testimony. Dr. Kirschner testified

that he had reviewed the autopsy reports and photographs, among other materials, to familiarize himself with this case. The prosecutor asked Dr. Kirschner, "[W]hat was the significance of your findings after you reviewed all of those things?" Record at 873. Dr. Kirschner responded:

> The significance of my findings were that this was a child who died as a result of child abuse. He died of multiple injuries, inflicted injuries, that included multiple blows to the head, strangulation, and blunt abdominal trauma that ruptured his bowel mesentery, that is the membrane that holds the intestines in place, and severely bruised his bowel.

Record at 873–74. At a sidebar conference, Kent again moved for a mistrial. The trial court took the motion under advisement pending the remainder of the doctor's testimony and cross-examination. Dr. Kirschner was extensively questioned by both parties and then excused by the trial judge. However, it appears from the record that the trial court never ruled upon Kent's mistrial motion. Because Dr. Kirschner's testimony was confined to his analysis of the medical findings, we find no evidence of intentional prosecutorial misconduct here. *See* Ind.Evidence Rule 702(a) (if specialized knowledge will assist the jury to understand the evidence, an expert witness may testify in the form of an opinion).

Kent also makes several additional allegations which he claims taken together, with the above instances, evidence a deliberate attempt to improperly prejudice him. We note Kent does not claim that any one of the following instances, in and of itself, constitutes prosecutorial misconduct. Rather, he argues that the various acts, taken together, evidence a deliberate attempt to improperly prejudice Kent. It has long been held by this Court that when an isolated instance of misconduct does not establish grave peril, repeated instances may evidence a deliberate attempt to improperly prejudice the defendant and result in reversal. *Maldonado v. State*, 265 Ind. 492, 498–99, 355 N.E.2d 843, 848 (1976); *see also Smith*, 516 N.E.2d at 1063. However, in this case, reversal is not warranted.

■ First, Kent argues that the prosecutor continued to argue in front of the jury after Kent had requested and received permission for a sidebar conference. The record reveals that after Kent made his objection and requested to approach the bench, but before the court granted the request, the prosecutor made one brief statement in response to the objection. We find no intentional misconduct by the prosecutor here. Rather, we find a misstatement of the record by Kent. Second, he argues that during the prosecutor's cross-examination of Kent, the prosecutor repeatedly asked Kent about the thought processes of the victim. The two questions pertained to whether or not the child victim ran into another room because he thought he was going to be punished. Kent's two objections were sustained and at a sidebar conference, the trial court declared that it was improper to ask questions regarding another person's thought processes. The prosecutor then abandoned this line of questioning. Again, we find no intentional misconduct.

■ Third, Kent argues that the prosecutor engaged in misconduct by making a disparaging comment about Detective Teeling's testimony after the detective had been excused from the witness stand. This was clearly inappropriate. However, it does not appear from the record that any of the jurors were in the courtroom to hear the comment, as the trial judge had dismissed them for lunch and the court reporter did not include the alleged statement in the record. The trial judge stated that he did not hear the comment and determined that no harm resulted. In its final instructions, the trial court specifically told the jurors that unsworn statements or comments of counsel were not to be considered as evidence. Record at 132. Moreover, after jury deliberations had begun, the State requested that the court question the jurors to determine whether any juror heard the comment. Kent opposed such an inquiry taking the position that doing so after deliberations had begun would be disruptive. The trial court agreed with Kent, noting that both parties had an opportunity, prior to jury deliberations, to ask the court to inquire if any juror heard

the comment. The trial court also concluded that any such remark by the prosecutor, if heard, would not be dispositive in this case because it had been "a hotly contested case on the record, with counsel disputing other counsel's questioning, recollection of the evidence and so forth...." Record at 1499. Finally, the record does not reveal that any effort was made after the verdict to discern any effect of the comment. The disparaging comment, while inappropriate, certainly did not approach the prejudice necessary for a mistrial.

■■■ The fourth instance of misconduct alleged by Kent was the prosecutor's comment during closing argument that Kent was a convicted felon.[1] However, Kent's prior convictions were all misdemeanors. Kent again moved for a mistrial. The trial court denied the motion and then promptly admonished the jury that Kent was not a convicted felon, but rather he had been convicted of misdemeanors. The trial court's admonishment was an appropriate curative measure. *Bradley*, 649 N.E.2d at 108 (reversible error is seldom found when the trial court admonishes the jury to disregard a statement).

In this case, the above instances taken as a whole do not evidence a deliberate attempt by the prosecutor to improperly prejudice the defendant. Most of the alleged instances of misconduct were not misconduct at all. In most cases, objections were made by the defendant and sustained by the trial court. In each case, the trial judge took appropriate curative actions. As noted by the trial judge, this was a "hotly contested case on the record" and each party was continually challenging the other. Record at 1499. But we cannot conclude that the record evidences a deliberate attempt on behalf of the prosecutor to prejudice the defendant improperly. Once the defense's objections were sustained, the prosecutor and the trial judge reacted and responded appropriately. From the record before us, the trial judge performed admirably in managing highly contentious and sometimes inappropriate conduct of counsel on both sides. Accordingly, even considering the alleged instances of misconduct as a whole, we conclude the trial court was well within its discretion in denying Kent's motions for mistrial.

## II.  Opinion Testimony

■■■ Kent argues that the trial court improperly admitted opinion testimony from Officer Michael Kuhn. Lay witnesses may testify in the form of an opinion if the testimony "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Ind.Evidence Rule 701. The determination of whether a witness is qualified to give an opinion is within the trial court's discretion. *Hawkins v. State*, 626 N.E.2d 436, 441 (Ind. 1993).

■■■ As the first instance of improper opinion testimony, Kent cites to a portion of Kuhn's redirect testimony. On direct examination by the State, Kuhn testified regarding the actions he saw Kent performing on the child when he arrived at the apartment. On cross-examination, Kent attempted to elicit testimony from Kuhn suggesting that Kent was trying to resuscitate the child. During the State's redirect examination, the prosecutor asked Kuhn, "Isn't it possible what the defendant was doing was in no way a rescue activity?" Record at 498–99. Kent objected and the trial court ruled that based on the evidence that had been presented, Kuhn could answer the question. Kuhn responded, "I believe it's possible that what he was trying to do was try to harm the child." Record at 499. As the second instance of improper testimony, Kent cites to another portion of Kuhn's redirect testimony during which the prosecutor asked Kuhn why he noted in his report that this case should be investigated by detectives. Kent's objection was overruled by the trial court, however, the trial court explicitly noted to the jury that Kuhn's opinion was not an expert opinion. Kuhn then testified, "In my opinion, the condition of the child is not conducive with a fall in the bath tub." Record at 507.

1. Comment on Kent's prior convictions was permissible because Kent had testified. *See* Ind.Evidence Rule 609.

In both these instances, Kent's objections were properly overruled. Officer Kuhn, who had emergency medical technician training and had viewed the child's injuries, based his opinions on his own observations. In the words of Evid.R. 701, these conclusions, though not expert, were "rationally based on [Kuhn's] perception" and were "helpful to a clear understanding" of Kuhn's own testimony. Evid.R. 701. The trial court did not abuse its discretion.

### III. Impeachment by Prior Statement

■■■■ Kent next claims that the trial court erred when it allowed the State to impeach Kent's testimony with a prior statement made to the State. Prior to being charged with murder, Kent and his attorney requested that Kent be allowed to make a statement in order to present "his side of the case." Record at 1098. Kent went to the prosecutor's office voluntarily, accompanied by his attorney, to give the statement. Kent now alleges that the statement was obtained by fraud, trickery, and deceit because, Kent contends, the prosecutor had already determined that they were going to charge Kent before he arrived.[2] Kent specifically alleges that the statement was fraudulently obtained because the detective and deputy prosecutor had signed the information and affidavit of probable cause on September 18, 1992, three days prior to taking Kent's statement on September 21, 1992. However, the testimony of the detective and the prosecutor clearly indicates that the decision to charge Kent was not made until after Kent had given his voluntary statement. Detective Teeling testified that he was present when the prosecutor dictated the charges to his secretary after questioning Kent on September 21, 1992. Thereafter, Detective Teeling and the prosecutor signed the information and probable cause affidavit. The prosecutor testified that the September 18, 1992 date on the information and probable cause affidavits were typographical errors. Furthermore, the file-stamped copies of both documents indicate that they were filed on September 21, 1992 at 3:46 p.m., which was after Kent's statement was taken. The trial court's finding of no

deception on behalf of the State is not clearly erroneous. Furthermore, Kent gave this voluntary statement to the prosecutor in the presence of his own counsel, without being subjected to a subpoena, and aware that he was free to leave. Thus, the trial court did not err in allowing impeachment by this prior, voluntary statement.

### IV. Peremptory Challenges

Kent next contends that the trial court improperly allowed the State to exercise peremptory challenges. This Court has outlined the following standard for reviewing peremptory challenges:

> For a criminal defendant to establish a *prima facie* case of purposeful racial discrimination in the selection of a jury, it must be shown that (1) the prosecutor has exercised peremptory challenges to remove members of a cognizable racial group from the venire; and (2) the facts and any other relevant circumstances of the defendant's case raise an inference that the prosecutor used that practice to exclude venirepersons from the jury due to their race. *Batson v. Kentucky,* 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69, 87–88 (1986), *as modified by Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Once such a *prima facie* showing has been established, the burden shifts to the State to present an explanation for challenging such jurors. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. The trial court then has a duty to determine whether the defendant has established purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88–89. Here the trial court's finding is accorded great deference. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21, 90 L.Ed.2d at 89 n. 21.

*Bradley v. State,* 649 N.E.2d 100, 105 (Ind. 1995) (footnote omitted). In *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the United States Supreme Court made clear that the second step requires only that a race-neutral explanation

---

2. Kent also argues that the State erred by failing to advise him of his *Miranda* rights prior to his statement. Kent appeared at the prosecutor's office with counsel; thus, any such argument is wholly without merit.

be given by the proponent of the peremptory challenge. The burden of establishing discriminatory intent remains with the party opposing the peremptory strike. *Id.* at ——, 115 S.Ct. at 1770–71, 131 L.Ed.2d at 839.

In this case, the State peremptorily challenged five prospective jurors from the first panel, four of whom were African–American. Kent objected to the State's use of peremptory challenges and argued that the State removed the jurors for discriminatory reasons. The trial judge, while noting that he did not think he saw a pattern of discrimination by the State, nevertheless reviewed and ultimately accepted the State's race-neutral responses for all of its challenges. After questioning a second panel, Kent objected to the State's removal of two additional prospective jurors. The trial court again accepted the State's race-neutral responses.

■ It is unclear from the record whether Kent established a *prima facie* case of purposeful discrimination. Although six of the nine prospective jurors peremptorily challenged by the State were African–American, the final jury was composed of five Caucasians, four African–Americans and three Hispanics. The removal of some African–American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination. *Hawkins v. State,* 626 N.E.2d 436, 440 (Ind.1993); *Phillips v. State,* 496 N.E.2d 87, 89 (1986). In any event, Kent argues that the reasons given for six of the seven excused jurors were pretextual. The record reveals that the State challenged two potential jurors because they believed in punishing their children by either hitting them on the hands with a ruler or striking them with a belt. The prosecutor reasoned that she removed those two jurors because this case involved inferences regarding the proper punishment for children and the State did not believe that either panel member could be fair. A third potential juror was removed because her son was a defendant charged in another case pending before the same court. The State removed a

fourth potential juror because he was reluctant to serve and did not want to convict anyone, but his mother talked him into fulfilling his civic duty. The fifth potential juror was removed because she said she felt uncomfortable dealing with a case involving the death of a child. In addition, the prosecutor inferred that she was unreliable and immature because she had recently quit her job with no real explanation. The State removed a sixth potential juror because the prosecutor found his answers to be evasive and because he wore dark sunglasses throughout the proceedings thereby preventing any eye contact with the attorneys.

■ The record clearly illustrates that the State provided race-neutral explanations for challenging the potential jurors and those explanations were accepted by the trial court. By accepting the State's race-neutral explanations, the trial court found no discriminatory intent. The finding as to discriminatory intent is a factual matter for the trial court. *Elem,* —— U.S. at ——, 115 S.Ct. at 1771, 131 L.Ed.2d at 840. As such, it will not be set aside by this Court unless clearly erroneous.[3] We cannot conclude that the trial court, who viewed these jurors, was clearly erroneous in accepting the State's explanations.

### V. Sentencing

■ Finally, Kent argues that the trial court erred in sentencing Kent by considering and relying upon letters the court had received from women who previously knew Kent. Although the actual letters were not made part of the record, both parties agree that each woman reported her view that Kent had been physically abusive in the past. We first note that Kent has waived this issue for appeal as he did not object to the court's use of the letters during the sentencing hearing. *Ingram v. State,* 547 N.E.2d 823, 829 (Ind.1989). Notwithstanding waiver, we reject Kent's contention that introduction of the letters was error. The determination of a sentence is within the trial court's discre-

---

**3.** *Elem* dealt with a habeas proceeding in federal court. Because it arose before the amendment to 28 U.S.C. § 2254(d)(8) included in the Antiterrorism and Effective Death Penalty Act of 1996, the standard of review there was that the state court's findings may be set aside only if they are "not fairly supported by the record." *Elem,* —— U.S. at ——, 115 S.Ct. at 1771, 131 L.Ed.2d at 840.

tion and is regulated by IND.CODE § 35–38–1–7.1 (1993). *Mayberry v. State,* 670 N.E.2d 1262, 1270 (Ind.1996). Subsection (a) of IC 35–38–1–7.1 specifically states that the court "shall consider" the defendant's character and the risk that the person will commit another crime. The sentencing judge specifically noted that he considered the letters on the issue of Kent's past and his character. Record at 1603. In addition, prior batteries, even if uncharged, may be considered by the trial judge. *Flinn v. State,* 563 N.E.2d 536, 544 (Ind.1990) (sentencing court may consider pending charges and uncharged crimes). Therefore, the trial court did not err by considering prior batteries in sentencing Kent.

### Conclusion

Kent's conviction for the murder of Joshua Verill is affirmed.

SHEPARD, C.J., DICKSON, SULLIVAN, and SELBY, JJ., concur.