# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 09 2016, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Terral Lerron Golden, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 9, 2016 <br><br> Court of Appeals Case No. <br> 71A03-1601-CR-167 <br><br> Appeal from the St. Joseph <br> Superior Court 2 <br><br> The Honorable John M. <br> Marnocha, Judge <br><br> Trial Court Cause No. <br> 71D02-1509-MR-14 |

**Mathias, Judge.**

[1] Terral Lerron Golden ("Golden") was convicted in St. Joseph Superior Court of murder and attempted murder. Golden appeals and presents two issues,

which we restate as: (1) whether Golden knowingly and intelligently waived his right to counsel, and (2) whether the trial court erred in overruling Golden's *Batson* challenge.

We affirm.

## Facts and Procedural History

On September 15, 2015, Lacy Patton ("Patton") and his friend Arles Slaven ("Slaven") went to a home on Douglas Road in St. Joseph County, Indiana. The home was known as a drug house, and Patton and Slaven went there to locate Haeli Stevenson ("Stevenson"), the mother of Patton's infant son. Stevenson had gone to the house with her baby so that she could buy marijuana from Tristan Gill ("Gill"), who lived at the home. Also at the home was the defendant, Golden, who was Gill's cousin.

Stevenson saw Patton and Slaven coming toward the home and warned Gill before trying to leave. Before she could leave, Stevenson ran into Patton. Patton saw Stevenson breastfeeding their child while smoking, and the two began to argue. Gill became involved, and he and Patton began to fight, with Patton punching Gill. Golden then asked Gill for his gun. Shortly thereafter, Patton heard Slaven say, "put the gun down, punk, put the gun down." Trial Tr. pp. 396-97. Patton ran to the room where Slaven was and saw Golden pointing the gun at Slaven. Golden then alternated pointing the gun at Slaven and Patton, which Patton described as if Golden were playing "eenie meenie miney mo." *Id*. at 397.

Patton then ran back to Stevenson to tell her that Golden had a gun. After Patton left the room, Golden shot Slaven, who died as a result of his injuries. After the gunshot, Gill, who had witnessed the shooting, was asked by the owner of the home what had happened. Gill told him, "a murder just happened." Trial Tr. p. 387.

On September 18, 2015, the State charged Golden with murder and attempted murder. At a pretrial hearing on October 6, 2015, Golden informed the trial court that he wished to represent himself. The trial court then engaged in an extensive colloquy with Golden regarding the dangers of self-representation:

| | |
|---|---|
| [Golden]: | I will be representing myself. |
| [Court]: | Okay. Has anybody talked to you about that and told you what the law is, concerning that? |
| [Golden]: | (indicates negatively) |
| [Court]: | Well, I want to make sure you understand, you have the right to be represented by an attorney. |
| [Golden]: | Right. |
| [Court]: | You have the right to hire your own lawyer, if you want to. |
| | If I find that you're indigent under the law, I can appoint a public defender for you at no cost. |
| | You also have the right to represent yourself. |
| [Golden]: | Right. |
| [Court]: | Although I strongly recommend against that. And the reason for that is, I can't give you any help, okay? |
| | I can't give you any advice, I can't tell you what to do, I can't tell you what not to do. |

| [Golden]: | Right. |
|---|---|
| [Court]: | And you are held to the same standard as a lawyer. |
| [Golden]: | Right. |
| [Court]: | So you can't, for instance, go to trial, be ineffective, get yourself convicted, then later on say you were ineffective, because the issue is gone. |
| [Golden]: | Right. |
| [Court]: | And these advisements that I'm going to go through here with you. . . well, I'll just read this, because I'm going to ask you to sign this. |

It says: I've been accused of a crime and have a copy of the charges. The judge has told me the nature of the charges and there may be lesser included offenses, defenses or mitigating circumstances about which I should know.

I know I have the right to a lawyer and the right to be my own lawyer.

The judge has warned me that that it's dangerous and almost always unwise to be my own lawyer, because I'll be held to the same standards of law and procedure as a lawyer and I will not get special treatment from the Court.

The judge has warned me that I may hurt my own case, and the State has an experienced lawyer.

The judge has warned me that a lawyer has skills and expertise in preparing for and conducting a criminal defense that I do not have, and that a lawyer will be better able to:

Number one, investigate and question witnesses, gather appropriate documentary evidence, obtain favorable defense witnesses, prepare and file pretrial motions, prepare appropriate written jury instructions, prepare opening and closing

statements, examine and cross-examine witnesses at trial, and recognize objectionable prejudicial evidence and testimony, and make proper objections to it.

Do you understand all those things?

[Golden]:    Yes, sir.

[Court]:    How far did you go in school?

[Golden]:    To the 12th.

[Court]:    So 12 years of education; is that correct?

[Golden]:    Yes, sir.

[Court]:    Have you ever been . . . have you ever seen a psychiatrist or psychologist for anything?

[Golden]:    No.

[Court]:    You understand the rules of evidence and procedure?

[Golden]:    Yes, sir.

[Court]:    Okay, how do you know that?

[Golden]:    I just know. I follow what I've learned.

[Court]:    And you understand the English language; is that correct?

[Golden]:    Yes, sir.

[Court]:    Now that I've given you these warnings, but I'm telling you that it's your choice.

[Golden]:    Yes, sir.

[Court]:    It's my advice to you that you hire a lawyer, but it's your choice. That you either hire a lawyer or you ask for a public defender and be represented by someone that's done this sort of stuff before.

But you understand that it's your choice?

[Golden]:    Yes, sir.

| [Court]: | Do you still wish to represent yourself? |
|---|---|
| [Golden]: | Yes, sir. |
| [Court]: | Is that your free and voluntary decision, is that what you want to do? |
| | Do you feel that's the best course in proceeding? |
| [Golden]: | Yes, sir. |

Pretrial Tr. pp. 3-7.

[7]    Golden then asserted his right to a speedy trial, which caused the court to warn him that a speedy trial might be helpful, but also might put pressure on him to get his case together in a short period. The court repeated its warning regarding self-representation, to which Golden responded, "I know what I'm doing." Pretrial Tr. p. 9. The trial court then set a trial date of December 14, 2015.

[8]    At another pretrial hearing held on October 27, 2015, Golden reasserted his right to self-representation, yet he also informed the trial court that he needed time to hire private counsel. At the subsequent November 5, 2015 hearing, Golden informed the trial court that he had been unable to retain private counsel. The trial court then appointed a public defender, Mark Lenyo, to represent Golden. At the next pretrial hearing on November 9, 2015, Golden's appointed public defender indicated that he could not prepare for Golden's trial in time for the December 14 trial date. The following exchange then occurred:

| [Golden]: | This ain't even my lawyer, Your Honor. |
|---|---|
| [Court]: | Well, he can be your lawyer and is your lawyer. |
| [Golden]: | I've asked for a speedy trial. |

| [Court]: | Well, you have a right to a speedy trial at a time when your lawyer can be prepared. |
| [Golden]: | I don't want him as my lawyer then. |
| [Court]: | You don't get any other lawyer. |
| [Golden]: | Oh, well. |
| [Court]: | You want to continue to represent yourself? |
| [Golden]: | Yes, sir. |
| [Court]: | Okay, Mr. Golden will represent himself, pro se. . . . Against my advice. |

Pretrial Tr. pp. 19-20.

[9]     The following day, the trial court brought the parties back into court to discuss the matter further. The court noted that requiring the public defender to prepare for the speedy trial date of December 14 "puts him kinda behind the eight-ball." Pretrial Tr. p. 24. The trial court therefore wanted to ensure that Golden understood that he had "an absolute right to represent" himself. *Id.* at 25. Golden indicated that he understood. The trial court further informed Golden:

> And you understand that, you have an absolute right to be represented by an attorney.
>
> And as I said to you before when you made the original waiver, I always suggest that a defendant in any criminal case, whether in custody or not in custody, that they get a lawyer. Because a lawyer has certain skills and training and knows the law and knows what to do, particularly in a complicated case.
>
> And more importantly, when you are in custody you don't have the ability to do the kinds of things a lawyer would do, because you're in custody.

And I want to make sure . . . I won't use the word scare you off, but when I was originally looking at my calendar I was talking May or something like that, but that's my mistake. Because I just initially assumed with this first appearance, that's what I would normally do in a murder case.

And so on one hand, I don't believe that I could force Mr. Lenyo to represent you, and force in effect to be incompetent as counsel, given the time frame.

I would certainly be willing to speed this trial up, you know, in more of the earlier part of next year, as opposed to April or May, if you wish to have Mr. Lenyo represent you.

But I wanted to make sure you were here and you could think about that. Because I think we would be looking probably more like mid-January or February rather than December.  Because I think I could put this case--

Pretrial Tr. pp. 25-26.

[10] Golden then interrupted: "This is my problem. . . .  My kid, my baby mother doesn't want him. So I'm the only one that can take care of the baby. I want to go through this while this trial is being done." Pretrial Tr. p. 26. The trial court warned Golden that, if convicted, he faced a long sentence and would never get to see his child. Golden responded, "And I'm willing to take that chance." *Id*. The court then noted that there was a hold on Golden from another jurisdiction and that, even if he were acquitted in this case, he might still be in custody. The court continued:

So I guess what I'm telling you, Mr. Golden, this is a murder case, you in representing yourself, if you get convicted, cannot later on claim that you were ineffective.

> And even in situations where lawyers are charged with a crime or lawyers are involved in some sort of civil case where they are a defendant, it's always the better practice that that person, the lawyer, even hire another lawyer to represent them, because you need that.
>
> And now [the prosecuting attorney] has told me that it really doesn't matter because of a hold in another jurisdiction on the 14th, as well.
>
> So I'm willing to do whatever you want me to do.

Pretrial Tr. pp. 26-27. Golden responded in no uncertain terms, "I want to keep my trial date." *Id*. at 27. The court also asked if Golden desired to continue to proceed *pro se*, to which Golden responded, "Yes, sir." *Id*. The trial court again asked, "I want to make sure that you are really clear about that," to which Golden again responded in the affirmative. *Id*.

[11] Still, the trial court was concerned about the situation, and on the next pretrial hearing on November 24, 2015, the court stated:

> Now Mr. Golden, I just want to go over this again one more time with you, because I think it's so important.
>
> You have told me that you . . . you've moved for a speedy trial, which I've honored. And you had told me that one of the reasons you want to get this over with, is that you have a child born and you don't believe the mother is an appropriate person to care for the child. So you want to get this done and get out of custody as soon as possible; is that correct?

Pretrial Tr. p. 31. Golden responded, "Yes." The court then had the following discussion with Golden:

[Court]:      But Mr. Fronk, the deputy prosecutor, the last time we were here said that no matter what happens in this case, whether you are found guilty or not guilty, or even if the State dismisses the case, there's a hold on you from another jurisdiction, so you are not getting out of custody, no matter what happens.

[Golden]:     That's already been dropped.

[Court]:      What?

[Golden]:     It's been dropped.

[Court]:      Well, I just have to tell you that.

And you know, the problem here is, this is a murder case. And the sentence is fairly severe in this case. You are looking at anywhere . . . if you were convicted, at 45 to 65 years in prison. And you would have to serve 75 percent of that, there's no day-for-day credit for these cases anymore.

You have a right to be represented by an attorney, you have a right to the appointment of an attorney at no expense to you, if you were found indigent. And I think I had already made that finding, because I had appointed a public defender.

You do have an absolute right to represent yourself.

Now the difficulty that we had here, if you recall, I appointed the public defender to represent you. Mr. Lenyo came here to enter his appearance, but he could not honor your speedy trial request.

I was a bit confused, as you recall, and I was talking about setting this off until April sometime, as I would do if you made your first appearance in a murder case today. And I had forgotten that you had already appeared and requested a speedy trial before counsel had been appointed.

I told you and Mr. Lenyo, that I could not force him to represent you and be unprepared. Just like I can't force any attorney to represent you when he's unprepared.

But I did say that what I would do, is instead of looking at April or May, that I would reset this as a first setting on a Monday and set this probably in mid-February, to allow your lawyer to get prepared in this case.

And you said you didn't want that, you wanted to go to trial in December as planned; is that correct?

[Golden]: Right.

[Court]: Now you understand that the other problem is, I really can't even appoint standby counsel for you. Because in a murder case there is so much information to go through, that I don't think there is going to be any lawyer who's going to say that he can give you advice in this case, if he can't be prepared.

And so it puts you in a real bind in this case.

I strongly . . . I will honor your request to represent yourself, pro se. But I strongly advise you that you consider these things and consider the ramification of representing yourself.

I think I told you that's never a good idea to represent yourself. And I think I had given you an example that even when attorneys get in trouble, they don't represent themselves, they hire another attorney to represent them.

[Golden]: Yes.

[Court]: I've got to get this case going, it's up in two weeks, we've summoned a jury in here. But I want you to think about that and I want you to . . . at this point

and time you're telling me you want to do this without a lawyer on December 14th; is that correct?

[Golden]: Yes.

[Court]: And you understand that at trial I can't help you, I can't give you advice.

[Golden]: I know that.

[Court]: You're going to have to be able to select this jury on your own, you're going to have to know the law, you're going to have to know how to make objections to keep inadmissible evidence out, you're going to have to know how to respond to objections . . . when the State objects to something you're doing.

You're going to have to know all the procedures in trial, including opening statements and final arguments and all that other kind of stuff.

And I just don't think there is really anyone who is equipped to do that and to represent themselves.

But you're telling me . . . please tell me, if I'm wrong, you still want to waive your right to a lawyer and go to trial on December 14.

[Golden]: Of course.

[Court]: Now let me tell you this, we are going to summon the jury and I want you to think about this.

If at any time in the next week that you change your mind and you start thinking that maybe you really do need a lawyer, just write a letter and give it to the jail, they'll get it to me, then I'll get you back here in court, okay?

[Golden]: Okay.

Pretrial Tr. pp. 33-36.

[12] The trial court again warned Golden about the dangers of self-representation at yet another pretrial hearing on December 9, 2015, shortly before the trial was to begin. This time, the trial court noted for the record that it had ordered Mr. Lenyo and Mr. Korpal, another public defender, to visit Golden in jail and speak with him regarding the procedures at trial. The court then went over the history of Golden's request to represent himself, his request for a public defender, and his rejection of the public defender who would be unprepared by the time of the speedy trial date. The court also noted that it had the probation department run a records check and confirmed that, contrary to Golden's earlier assertions, there were still two pending parole holds on Golden from California. Thus, the trial court told him, "no matter what happens in this case, you have to understand that you're not going to be getting out of custody." Pretrial Tr. p. 40. Golden seemed unconcerned and stated "I got to take one at a time." *Id.* The court again warned Golden of the dangers of self-representation, stating:

> Well, what I'm suggesting to you, Mr. Golden, is that you re-think your decision to represent yourself in this case.
>
> Because I'm telling you that my experience and about everybody else's experience is, that in most cases that's the surest way to get yourself convicted.
>
> As I said, if you want an attorney, I'll appoint an attorney. And it would require that your trial be continued, but I would continue it for no more than 60 days. I would instruct that attorney has to be ready within that time and I would make that a priority case so it is not bumped or set over by some other case.
>
> But that's something that you really have to think about.

> Because as I've said, you have an absolute right to represent yourself, but you also have an absolute right to have an attorney.
>
> I don't know anything about your case, I don't know anything about the facts of your case, I don't know how strong or weak the State's case is, I don't know anything about any defenses you may have. I hear that stuff for the first time at trial, when the jury hears it.
>
> But I'm telling you that you greatly increase your chances of conviction by representing yourself.

Pretrial Tr. pp. 40-41. Golden responded simply, "I'm ready for trial." *Id*. at 41.

[13] One last time, at the very beginning of Golden's trial, the court repeated its history of warnings regarding Golden's decision to represent himself. The court also reiterated that Golden had holds from California that would mean that he would not go free if acquitted, but instead be turned over to California authorities. The court then asked Golden yet again, "And you still said that you did not want to delay the trial, in order to have a lawyer assist you. Is that true?" Golden replied, "Yes." Trial Tr. p. 8. The court then advised Golden about the severity of the sentence he was facing if convicted, and Golden indicated that he understood this. The court continued its discussion with Golden as follows:

> [Court]: I just want to make sure that you understand that again, I strongly suggest that you get the advice of a lawyer in this case; do you understand that?
>
> [Golden]: (indicates affirmative)

| | |
|---|---|
| [Court]: | Not only for the purpose of conducting the trial, if it comes down to that, but you had written me a letter concerning how you thought it best to resolve this case and the kind of plea offer or plea you might be take to get this case resolved. |
| | But that's something that a lawyer would negotiate with the State for you; do you understand that? |
| [Golden]: | (indicates affirmative). |
| [Court]: | And the State may say, "Sure," the State may say, "No." |

* * *

| | |
|---|---|
| | I really want, Mr. Golden, for you to think about this, because the stakes are so high. |
| | I would probably have the same conversation with a person who was going to trial facing a minor charge, because I think anytime a person has been in custody, it's their time, not my time. But you understand that this is so important. |
| | Is there anyone in the courtroom today, friends or family, whose advice you trust? |
| | (Whereupon, the defendant indicates toward the back of the courtroom.) |
| [Court]: | Would you like . . . I won't allow more than two, but would you like some time to talk to those people about what I've said to you, and to reconsider whether you want me to appoint a lawyer for you? |
| [Golden]: | No, thanks. |
| [Court]: | And I'm telling you, Mr. Golden, it's now December 14th, I would have this set for trial within 60 days, you know, if you wanted that. |
| [Golden]: | I'm good. |
| [Court]: | Are you sure? |

[Golden]:     Yes, sir.

Trial Tr. pp. 9-11. The case then proceeded to trial.

[14]     During voir dire of the jury panel, the prosecuting attorney asked Juror 49 several questions. Juror 49 indicated that, although he was not enthusiastic about being selected as a juror, he would do so if asked. The prosecuting attorney then asked him, "Okay. On your form I think you also indicated that someone you knew or someone close to you had either the victim or a defendant in a criminal case; is that correct?" Juror 49 responded, "Yes, sir." *Id*. at 162. When the prosecuting attorney asked, "Can I ask which side it was?" Juror 49 responded, "No, you cannot." *Id*. Juror 49 then continued:

> The point that I'm trying to make, is that anything that I personally have done, does not have anything to do with this person over here, as far as what he has done, what he would be charged for. So none of what I did, would be relevant. I've already told you that I'm the kind that would take the facts and the evidence that you have to present. You are the prosecutor, he's the defendant, you would make your case and I would take all of what you all say, then make a decision based on that. There is nothing else that I have to add to the conversation or questioning that's taking place, that's nothing.

*Id*. at 162-63.

[15]     The prosecutor continued to question Juror 49 regarding how life experiences can influence one's view of things, and eventually asked, "If your moral feelings doesn't [sic] agree with the law a hundred percent, which one are you going to follow, sir?" *Id*. at 165. Juror 49 responded:

I do believe there is something to where there was probable cause.

Again, it would have to be to the extent of what the situation is, what took place and why did it take place. And then you would make your decision based on that.

I've sat here about two and-a-half hours and we've talked about CSI and all of this other stuff, which is really not applicable to what really needs to be taking place here. We're talking about a trial. He's on trial for . . . what, two charges? One being murder and one being charged as attempted murder, and that's a very serious issue. That's the way we have to look at it and that's, you know, pretty much the way I said it.

*Id.* at 165-66.

[16] Subsequently, the State used a peremptory strike against Juror 49, who was African-American. The trial court determined that the State had a race-neutral reason for using the peremptory strike on the juror: that the stricken juror had told the prosecuting attorney that he was wasting time by asking him questions.

[17] At the end of the three-day trial, the jury found Golden guilty as charged. At the January 15, 2016, sentencing hearing, the trial court entered judgments of conviction on the jury's verdict and sentenced him to sixty-five years on the murder conviction and a consecutive term of forty years on the attempted murder conviction, for an aggregate sentence of 105 years.[1] Golden now appeals.

---

[1] At the sentencing hearing, the trial court stated that it was imposing a fifty-year sentence on the attempted murder conviction. The trial court corrected this misstatement in its written sentencing order issued later that day.

# I. Right to Counsel

Golden first argues that the trial court failed to properly advise him of the risks of representing himself and that his waiver of his right to counsel was therefore not made knowingly and intelligently.

The Sixth Amendment, applicable to the states by way of the Fourteenth Amendment, guarantees a criminal defendant the right to counsel before he may be tried, convicted, and punished. *Hopper v. State*, 957 N.E.2d 613, 617 (Ind. 2011) (citing *Faretta v. California*, 422 U.S. 806, 807 (1975)). The Sixth Amendment right to counsel also encompasses the affirmative right for a defendant to represent himself in a criminal case. *Id*. However, it is "undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id*. (internal quotations omitted). Because a defendant who waives his right to counsel forgoes many of the traditional benefits associated with the right to counsel, the defendant must "knowingly and intelligently" forgo these benefits. *Id*. Accordingly, a defendant who wishes to proceed *pro se* should be made aware of the dangers and disadvantages of self-representation such that the record will show that he "knows what he is doing and his choice is made with eyes open." *Id*. (internal quotations omitted).

No particular formula or script must be read to the defendant; instead, the information that must be given depends on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily

grasped nature of the charge, and the stage of the proceeding." *Id*. (citing *Iowa v. Tovar*, 541 U.S. 77, 88 (2004)).

[21]     Drawing on precedent from the federal Seventh Circuit, our supreme court has held that courts determining whether a waiver of counsel was made knowingly and intelligently must consider: (1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*. *Id*. (citing *United States v. Hoskins*, 243 F.3d 407, 411 (7th Cir. 2001)).

[22]     Here, the trial court engaged in a repeated, extensive inquiry into Golden's desire to represent himself. The trial court repeatedly warned Golden of the dangers of self-representation and of the court's willingness to delay the trial as little as possible for counsel to prepare in order to accommodate Golden's desire for a speedy trial. Still, Golden repeatedly and steadfastly insisted on representing himself. Thus, Golden was well advised of the dangers of self-representation, and the court went out of its way to inquire into Golden's decision to proceed *pro se*.

[23]     Moreover, the record indicates that Golden has an extensive criminal history. Indeed, at sentencing the trial court noted that Golden had a history of delinquent behavior as a juvenile, including brandishing a weapon and assault with a deadly weapon, which would be serious felonies if committed by an

adult. He also had several adult felony convictions in California. In other words, Golden had extensive experience in the criminal justice system, further indicating that he knew the dangers and disadvantages of self-representation. Moreover, nothing in the record suggests that Golden suffers from any mental or intellectual problems, and he went to school through the twelfth grade and had no difficulties in understanding the English language.

[24] Golden was insistent on a speedy trial date, as was his right. *See* Ind. Crim. Rule 4(B)(1).[2] However, the exercise of this right was not without consequences, and when given the choice of a trial within seventy days and the assistance of counsel, Golden insisted on his early trial every time. Thus, we think Golden's choice to proceed *pro se* was strategic. *See Kubsch v. State*, 866 N.E.2d 726, 738 (Ind. 2007) (noting that a defendant who waives his right to counsel for strategic reasons tends to do so knowingly).

[25] Under the facts and circumstances present in this case, we have little difficultly in saying that Golden knowingly and intelligently waived his right to counsel. Indeed, we have encountered few cases where a trial court was more thorough in its repeated warnings regarding the dangers of self-representation.

---

[2] Although Criminal Rule 4 implements a defendant's constitutional right to a speedy trial, courts review claims of Criminal Rule 4 violations separately and distinctly from claims of the constitutional right to a speedy trial. *Logan v. State*, 16 N.E.3d 953, 958 (Ind. 2014). Although a delay in Golden's trial might have extended the trial beyond the seventy-day limit imposed by Criminal Rule 4(b)(1), this delay would likely not have implicated Golden's constitutional right to a speedy trial. *See McClellan v. State*, 6 N.E.3d 1001, 1005 (Ind. Ct. App. 2014) (noting that, in the context of the constitutional right to a speedy trial, a delay in trial is not presumptively prejudicial until more than one year has passed).

Accordingly, we reject Golden's claim that he was denied his right to counsel. *See Butler v. State*, 951 N.E.2d 255, 261 (Ind. Ct. App. 2011) (holding that defendant knowingly and intelligently waived his right to counsel where trial court, even though it did not repeat its advisements, advised him that defendant had the right to an attorney and that an attorney would be appointed for him if he could not afford one, and where the record indicated that defendant had extensive experience with the criminal justice system and asked for and received appellate counsel); *Castel v. State*, 876 N.E.2d 768, 771 (Ind. Ct. App. 2007) (holding that defendant did not knowingly and intelligently waiver her right to counsel where trial court neither advised her at trial about her right to counsel nor warned her about the dangers of self-representation and record was devoid of any evidence showing defendant's understanding of the disadvantages of self-representation, her background and experience, or the context of her decision to proceed *pro se*); *Atkinson v. State*, 810 N.E.2d 1190, 1192 (Ind. Ct. App. 2004) (holding that defendant did not knowingly and intelligently waive his right to counsel where he was not advised of his right to counsel or the dangers of self-representation).

## II. Batson Challenge

[26]   Golden also claims that the trial court erred in overruling his *Batson* challenge to the State's use of one of its peremptory challenges to remove an African-American from the jury venire. "Purposeful racial discrimination in selection of the jury violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476

U.S. 79, 86 (1986). The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Equal Protection Clause of the Fourteenth Amendment. *Addison v. State*, 962 N.E.2d 1202, 1208 (Ind. 2012) (citing *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). In *Batson*, the United States Supreme Court set forth a three-part process to address claims of the improper use of peremptory challenges. *See id*.

First, the defendant need only show circumstances raising an inference that improper discrimination occurred. *Id*. (citing *Johnson v. California*, 545 U.S. 162, 170 (2005). At this stage, the defendant's burden is relatively low and commonly referred to as a "prima facie" showing. *Id*. Using a peremptory strike to remove some African-American jurors does not, by itself, raise an inference of racial discrimination. *Addison*, 962 N.E.2d at 1208 (citing *Kent v. State*, 675 N.E.2d 332, 340 (Ind. 1996)). However, the removal of the only African-American juror on the panel does raise an inference that the juror was excluded on the basis of race. *Id*. (citing *McCormick v. State*, 803 N.E.2d 1108, 1111 (Ind. 2004); *McCants v. State*, 686 N.E.2d 1281, 1284 (Ind. 1997)).

If the requirements of the first stage are met, then, at the second stage, the burden shifts to the prosecution to offer a race-neutral basis for striking the juror in question. *Addison*, 962 N.E.2d at 1208 (citing *Synder*, 522 U.S. at 477). An explanation is considered race-neutral if, on its face, it is based on something other than race. *Id*. (citing *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2001)). Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Id*. (citing *Purkett v. Elem*, 514 U.S.

765, 768 (1995)). Although the race-neutral reason must be more than a mere denial of improper motive, the reason need not be particularly persuasive, or even plausible. *Id*.

[29] Third, the trial court must then determine, in light of the parties' submissions, whether the defendant has shown purposeful discrimination. *Id*. Although the burden of persuasion on a *Batson* challenge rests with the party opposing the strike, the third step—determination of discrimination—is the duty of the trial court judge. *Id*. (citing *Jeter*, 888 N.E.2d at 1264-65; *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)). It is for the trial court to evaluate the persuasiveness of the proffered race-neutral justification at the third step of the analysis. *Id*. It is at this stage that "'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.'" *Cartwright v. State*, 962 N.E.2d 1217, 1221 (Ind. 2012) (quoting *Purkett*, 514 U.S. 765 at 768. At this final step, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual. *Id*.

[30] Upon appellate review, we give great deference to the trial court's decision concerning whether a peremptory challenge is discriminatory, and the trial court's decision will be set aside only if it is clearly erroneous. *Id*. (citing *Forrest*, 757 N.E.2d at 1004; *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

[31] Here, Golden challenges the State's use of a peremptory strike to remove Juror 49 from the venire. However, Golden acknowledges that, had Juror 49 not been

stricken, he would not have served on the jury; instead, he would have been selected as the second alternate juror.

[32] Neither the United States Supreme Court nor the Seventh Circuit Court of Appeals has yet extended *Batson* to alternate jurors. *See United States v. Canoy*, 38 F.3d 893, 899 n.6 (7th Cir. 1994); *see also Carter v. Kemna*, 255 F.3d 589, 592-93 (8th Cir. 2001). More importantly, this court has held that *Batson* does not apply to peremptory strikes of alternate jurors who do not participate in deliberations. *See Johnson v. State*, 722 N.E.2d 382, 382 (Ind. Ct. App. 2000) ("because the alternate juror [on whom the State used a peremptory challenge] did not participate in jury deliberations, Johnson could not have been harmed by the trial court's decision."). Based on this reason alone, we could affirm the trial court's decision. However, even if *Batson* did apply, Golden would not prevail.

[33] Golden argues that the trial court failed to require the State to meet its burden under the second step of the *Batson* analysis by offering a race-neutral reason.[3]

[34] We disagree. The prosecuting attorney explained his reason for striking Juror 49 was that the juror, "basically told me that I had been wasting everybody's time by asking all these questions all day, so . . . ." *Id*. at 174. The trial court

---

[3] The State argues that, even though the prosecuting attorney did offer a race-neutral reason, Golden did not even meet the relatively low burden of step one. It is true that there is little direct indication in the record that Juror 49 was the only African-American in the venire. However, when the State indicated its intention to use a peremptory strike on this juror, the trial court stated that it would require the State to offer a race-neutral explanation for the use of the peremptory strike. Thus, we may safely presume that the trial court felt that the first step of the *Batson* analysis had been satisfied.

also noted that Juror 49 had refused to answer one of the prosecutor's voir dire questions.

[35] Under these facts and circumstances, we cannot say that the trial court's conclusion that the State offered a race-neutral reason was clearly erroneous. The prosecuting attorney's exchanges with Juror 49 were, at times, contentious. Also, the prosecuting attorney gave a facially non-race-based explanation for the use of his peremptory challenge on Juror 49, i.e., that the juror had a negative attitude toward the prosecuting attorney. *See Ross v. State*, 665 N.E.2d 599, 602 (Ind. Ct. App. 1996) (holding that State's use of peremptory strike on African-American juror was facially race-neutral where it was based on juror's "body language" and the general "lack of rapport" between the juror and the prosecutor). Nor is there any indication here that the State failed to challenge non-African Americans who had given similar responses to Juror 49. *Cf. Addison v. State*, 962 N.E.2d 1202, 1215 (Ind. 2012) (holding that trial court erred in ruling that State's use of peremptory strike to remove African-American juror was permissible where non-African-American jurors gave answers "strikingly similar" to the answers given by the stricken juror that formed the State's proffered "race-neutral" reason for striking the juror). We therefore conclude that the trial court did not clearly err in rejecting Golden's *Batson* claim.

## Conclusion

[36] The trial court gave repeated and detailed warnings and advisements to Golden regarding his decision to represent himself at trial, and Golden had extensive

prior experience in the criminal justice system. His decision to proceed *pro se* also appears to have been strategic. We accordingly reject Golden's claim that his waiver of his right to counsel was not knowingly or intelligently made. Also, even if *Batson* were to apply to alternate jurors, the State gave a facially race-neutral reason for its use of a peremptory challenge. Therefore, we cannot say that the trial court's rejection of Golden's *Batson* claim was clearly erroneous.

[37] Affirmed.

Robb, J., and Brown, J., concur.